[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF LAW
This custodial dispute, arising within a dissolution action, involves a plaintiff wife, aged 31, and a defendant husband, aged 36, who married in Willimantic, Connecticut, nine years ago, on October 9, 1982. It was the first marriage for each. Both parties have been residents of this state for at least the twelve months next preceding the filing of the complaint.
Two minor children were born of this marriage: David A. Nichols, Jr., born July 25, 1984, 7 years of age, and Cassandra Ann Nichols, born December 4, 1986, 5 years of age.
No other minor children have been born to the wife since the date of the marriage. No individual or agency is presently responsible by virtue of judicial award for the custody or support of any child. Neither the state of Connecticut or any town thereof is contributing or has contributed to the support CT Page 10428 or maintenance of a party or child of said party.
This action involved 42 preliminary filings which resulted in 18 orders or agreements before five judges and concluded in an eight day trial before this court with a total of nineteen witnesses.
Attorney Sheila Horvitz represented the plaintiff mother.
Attorney Lorraine Eckert represented the defendant father.
Attorney William Bingham represented the minor children.
The trial focused largely on minutia. It produced testimony that grew in interest to the parties as the trial proceeded and that led to successive waves of cross and redirect examination, all without generating a similar fascination for the court. From its inception, it absorbed judicial resources out of proportion to its basic issues. It expanded to reflect the parties' custodial determination. It mirrored their wholehearted commitment to achieving personal victory.
Mrs. Nichols was a good mother, a traditional housekeeping mother, who nurtured her children without incident and without spousal complaint throughout their early years. She was distressed by father's absence, but his attention to producing income was the traditional path they had chosen for themselves.
She lacked some confidence in her parenting instincts, but was determined to do well for her two children, so she read parenting books, took parenting classes, and looked to the children's pediatrician for direction and advice whenever she was in doubt.
Father's relationship with the children was a good one, but it was secondary to his primary role as a wage earner and to mother's primary role as housekeeper and nurturing parent.
When the pressures of housekeeping and child rearing stressed plaintiff mother to the point of seeking more help from her husband, he did not respond with assistance. He generated still more stress. He seemed unable to refocus. Their social friends, the Bendoraitises, became increasing factors in their lives. They rendered opinions on family matters. They guided the family through private business choices. Christine Bendoraitis became intimate with the family's finances by keeping plaintiff husband's business books. Christine Bendoraitis also prepared the checks for family expenses, a role defendant father denied to his wife. The climax of their pattern of displacing the plaintiff mother in her family role was their decision to CT Page 10429 hold a private birthday party for Cassandra from which Cassandra's mother, the plaintiff, was excluded, all with defendant husband's apparent blessing. When open physical warfare broke out between his wife and Christine Bendoraitis, Mr. Nichols responded with studied neutrality which both Mrs. Nichols and the court read as being openly unsupportive of his wife — and demeaning.
In spite of his behaviour towards his wife, defendant is clearly a father eager to retain his relationship with his children. His children appear equally eager to retain their relationship with him.
Though the trial was fiercely competitive and wide ranging, the basic issues were generally similar to many that come before the court. It is for cases such as these that joint custody is often so well suited. It enables the court to recognize the primacy of the nurturing parent while assuring the other parent a continuing and enforceable relationship with the children. And it offers it peacefully, in a form that does no damage to the minor children, in a form that often enhances their life after the dissolution of their parents' marriage.
The problem arises when the parent whose role has not been primarily child focused decides that continuing the secondary parenting role that had been voluntarily assumed over the child rearing years is no longer sufficient. That parent then decides to either replace the other parent as custodian or to demand an equal custodial role. With not much in the way of dramatic evidence to support a change of custodianship, having made no complaint about the nurturer's efforts before the divorce action began, it becomes necessary to look about for those incidents that may have been minor at the time but might now be organized to support a theme of parental inappropriateness. It also becomes necessary to find allies who would assist in the assault. Some, like Mr. and Mrs. Bendoraitis, make themselves readily available. Others have to be purchased. And so, child experts are hired. What is factually, and historically, a rather simple dispute, now becomes an eight day trial.
Of course, the child nurturer has to make a contribution or the issue would be too simple to support such an extended trial. In this case the plaintiff mother brought little Cassandra to a consultation with her pediatrician to examine the possibility of sexual molestation by her father. The pediatrician referred the issue to the Department of Child and Youth Services which investigated and found reasonable suspicion, what it referred to as "red flags". At that point, plaintiff mother filed ex parte motions in court, father was removed from CT Page 10430 the family home and his visitation was curtailed. That investigation, and the process that followed, intensified the dispute and confirmed father's fear that the custodial mother would seek to eliminate him from their childrens' lives. Father was convinced that mother's behavior was malicious and calculating. It confirmed his worst fears. He maintains that feeling to this day. His fears have other bases: mother did not include father on the day care list for emergency notification, she unilaterally changed David's school, and she restricted his telephone access to the children in ways that seemed arbitrary.
Dr. Walter Borden, a psychiatrist of fine repute, was appointed by the court to evaluate the charge of sexual abuse. He found no substantiation for the possibility of child abuse. Plaintiff mother accepted that finding of Dr. Borden during her direct testimony. The doctor testified further that mother's role was "inadvertent" and that her claims were used "unconsciously". Though he found the allegations damaging, he did not see the damage as "irreversible". Dr. Borden reported that defendant father made no claims to indicate the mother was a bad parent. He went on to make custodial recommendations, beyond the role assigned him by the court. His recommendations were based upon an investigation that was more than a year old and, thus, could not reflect the current best interests of the children. O'Neill v. O'Neill, 13 Conn. App. 300, 303 (1988).
David Mantell, Ph.D., was hired by defendant father to evaluate the custodial issue, the third and last of the three specialists to become involved. Dr. Mantell is a fine clinical psychologist, known to the court to be a skilled evaluator. With regard to plaintiff mother's possible calculated and malicious intent, Dr. Mantell testified he had "no reason to think the mother was lying". "I know a lot of mothers take them (children they suspect may have been sexually abused) to pediatricians. It is a well traveled path many mothers take."
Dr. Mantell advised the court that he had not interviewed Mrs. Nichols. In doing that, he understood that any custodial evaluation or recommendation he might make involving Mr. Nichols would be seen as being based upon an incomplete factual foundation.
Dr. Mantell felt more strongly than did Dr. Borden about the issue of sexual abuse. Whereas Dr. Borden was of the opinion that the damage done as a result of the allegation could be limited, Dr. Mantell saw substantial direct damage and believed the allegation was a major issue. At the same time, he testified that he had no opinion as to who would be the better caretaker of the children. Nor would Dr. Mantell recommend that young CT Page 10431 David be returned to the home in Lebanon, where his father lived.
Dr. Mantell's initial response to the evaluation by Sharon Kesten, the Family Relations Counselor was that her report was "superficial". He found fault with the manner in which she dealt with the issue of sexual abuse, feeling she failed to assign it sufficient importance.
As regards the allegation, Counselor Kesten reported the following:
 ". . . mother alleged that father had sexually molested Cassandra, a charge father adamantly denies. In August, 1990, the Department of Children and Youth Services investigated the allegations, felt there was a reasonable suspicion that abuse had occurred, but could not substantiate the allegations . . . The allegations were also referred for psychiatric evaluation (to Dr. Borden), and were not substantiated by that evaluator. In addition, a hearing before the court at which this counselor testified led the court to remove the requirement for supervision of father's visits. Since the allegations of sexual abuse have been addressed by the psychological evaluation and the Court, no further assessment of the allegations will be made by this counselor in this report."
Later in his testimony, Dr. Mantell expressed respect for Counselor Kesten's thoroughness and concluded:
 "If she hadn't left out the child abuse allegation, she'd have done a fine job. It's a good report."
Clearly, Dr. Mantell believed the allegations were of overriding importance. Dr. Borden was not of the same mind, nor was Counselor Kesten.
This court is concerned with the misuse of such potentially destructive allegations inserted into a custodial dispute for custodial gain, and has dealt harshly with it in the past. See Livingston v. Livingston, FA-84-0291047S, J.D. of Hartford/New Britain at Hartford, March 1, 1990.
In the instant case, both of the experts presented by defendant father saw the mother's behavior as non-malevolent under the circumstances.
The Court concurs and urges the mother to put the episode behind her.
FRC Kesten basically recommended custody of both minor CT Page 10432 children to the plaintiff mother with alternate weekends and some midweek time for the defendant father. Hers was by far the most complete of the three investigations. None of the others interviewed both parents, both children, the childrens' teachers, the children's physicians, neighbors, friends, and the family of each of the principals. Sharon Kesten testified to giving the equivalent of approximately three full forty hour weeks to the investigation and evaluation process, far beyond the time invested by the other two evaluators.
This court is not often privileged to benefit from the efforts of three such skilled evaluators. The limits of both Dr. Borden's and Dr. Mantell's reports have been noted, but their efforts have never-the-less been of considerable use to this court. Their professional demeanor was exemplary.
It is to Counselor Sharon Kesten that this court turns, however, for the most extensive research, for the most helpful insights and for the most credible recommendations.
Counselor Kesten concludes that this case involves two good parents who have focused on their continuing anger rather than on what is best for their children. Neither party is a bad person or parent, she reports.
She observes that it was Mrs. Nichols who provided most of the daily care before the couple split, and that no information points to her being anything but a good mother. Thus, Counselor Kesten saw no reason to change the current parenting plan and observed that the childrens' best interests would be served by less back and forth visitation than the current arrangement provides.
This court finds neither party is solely at fault in the dissolution of this marriage. Mrs. Nichols resented the subordinate role she was assigned. When she felt overwhelmed by her responsibilities as a mother and housekeeper, Mr. Nichols failed to respond. Though he provided for all their financial needs, Mr. Nichols neglected the emotional needs of his wife and children. Having failed to recognize the validity of Mrs. Nichols complaints, Mr. Nichols bears the greater responsibility for the marital breakdown.
On balance, Mrs. Nichols is the more credible of the two.
There were many disputes between the parties involving relatively minor issues. One of them may help to illustrate the court's view of the parties relative credibility. Mrs. Nichols testified that the Baby Book she created for young David CT Page 10433 (Defendant's Exhibit 2) disappeared one day, taken without her permission. Mr. Nichols testified he found the Baby Book in a pile of garbage left behind by Mrs. Nichols when she vacated the family home. Upon inspection of the Book, noting the many entries, and upon the testimony of both Mr. and Mrs. Nichols, it became clear that all the entries in the Baby Book were made by Mrs. Nichols and that they required considerable effort to complete. This court finds Mr Nichols' testimony that his wife left that Book in the garbage in the midst of this custody dispute to be lacking in credibility. The disappearance of the Book, its reappearance in the garbage and the subsequent allegations also serve to illustrate the petty level to which this trial sometimes descended.
Defendant father has superior income, vocational skills and employability and superior opportunities for future acquisition of capital assets and income.
The court finds the family home to have a fair market value of $180,000, mortgages of $58,490 and an equity of $121,510. Defendant father has a net income of $336 and plaintiff mother a net income of $186.
Plaintiff mother advised the court she did not wish to retain title to the family home. She makes no claim to a continuing interest in the family business, Nichols and Son Electric. No expert testimony was offered to indicate the value of that business.
In view of the disappointment that inevitably accompanies a court's findings, the bitterness exhibited by the defendant's mother when she testified, the lack of respect shown towards the mother of his children by the defendant father and his close friends, the Bendoraitises, and in view of defendant father's claim of plaintiff mother's continued references to father's alleged sexual abuse, it does not seems likely that this lengthy trial will have a cathartic result.
The bitterness has been so great, plaintiff mother testified, that when defendant father vacated the family home, he emptied the freezer of all the food: hamburgers, roast beef, chicken, hot dogs, kielbasa, bread, rolls, and ice cream, leaving nothing for the children's meals. That testimony was not satisfactorily contradicted.
Unless their parents' differences are addressed through the assistance of child centered counseling, and unless their parents' communication skills and parenting skills improve, young David and Cassandra are doomed to a childhood of pain. Counsel for the minor children expressed it in these terms: CT Page 10434
 "The inflexibility and intransigence of both parents and their counsel in this matter are substantially responsible for exacerbating the insecurity and emotional pain the children are suffering. If that intransigence continues into the future, the children will continue to suffer."
If Mr. Nichols has hopes of increasing his parenting role with David and Cassandra, he should be aware that future courts are likely to look with interest at his sincere participation in both communication and parenting skill counseling with Mrs. Nichols as well as the quality of the parenting relationship the parents are able to achieve after this dissolution. Mr. Nichols' ability to move beyond his current anger, and his ability to avoid becoming the source of others' anger against the mother of his children, may well become a major factor in his future relationship with David and Cassandra, as will Mrs. Nichols willingness to sincerely participate in that communication and parenting counseling and deal with her own anger, deal with her need to afford the children reasonable access to their father and deal with any lingering doubt she may still privately harbor regarding the earlier allegation of child abuse.
The counseling will succeed only to the extent that it involves a skilled counselor totally independent of either parent. If the parties decide to undertake such counseling but are unable to agree upon a choice, the court may be contacted for a recommendation.
ORDERS:
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes. a finding shall enter that the marriage has broken down irretrievably, a decree of dissolution shall enter and the following orders shall apply:
1. LEGAL CUSTODY:
a. The parties shall each have joint legal custody of the minor children.
b. Primary physical custody shall be with the plaintiff mother.
c. Defendant father is to have access to all of the childrens' health and educational reports and status. Plaintiff mother is to notify those involved with the childrens' health CT Page 10435 care and educational programs of defendant's right to such access.
2. FINAL DECISION MAKING
a. The joint legal custodians shall consult with one another on major decisions affecting the childrens' health, education and welfare.
b. If consultation between the parents with regard to such major issues does not produce an agreement after an exchange of views, the primary physical custodian shall have the final decision making power.
c. The parent exercising primary physical custody shall make all day to day decisions and shall determine the manner in which the children are to be raised with regard to those non-major issues
3. FATHER'S ACCESS
a. Father shall have access to his minor children on alternate weekends, from Friday at 4:30 pm to Sunday at 7 pm and Wednesdays from 4:30 pm to 7:30 pm.
b. Whenever father is exercising his rights of access to the minor children, whether it is for the normal weekly schedule, for holidays or vacations, he is to advise mother of their location and telephone numbers during the access.
4. HOLIDAYS AND VACATIONS
a. Parents shall alternate Memorial Day, July 4th, Easter Sunday, Labor Day, Thanksgiving, Christmas Eve, Christmas Day, and the childrens' birthdays.
b. Mother will establish the alternating schedule.
c. Father shall have Father's Day. Mother shall have Mother's Day.
d. Each of the parties shall enjoy similar and equal vacations with the minor children during the summer months. The schedule of those vacations are to be negotiated by the parents without resort to the physical custodian's final decision making powers.
e. The court specifically empowers, and encourages, the parents to vary any portion of the access, holidays and visitation in any mutually agreeable manner. CT Page 10436
f. There shall be open telephone contact between each parent and the children when the children are in the care of the other parent. Telephone contact shall be at reasonable times, for reasonable lengths of time, and at such times of the day as to minimize conflict with the childrens' meals, sleep schedule, homework, study and scheduled activities. If difficulties arise, mother is to notify father of a specific hour of the day, reasonably convenient to father's schedule, when a telephone call can be placed and mother is to schedule the childrens' activities with the father's telephone calls in mind.
4. CHILD SUPPORT
a. As requested by plaintiff in her Claims for Relief, defendant shall pay plaintiff child support of $95 each week.
b. Said child support payments are allocated $65 for Cassandra, $30 for David.
c. That sum is not reflective of the recommendations of the Child Support Guidelines. In a dispute such as this, however, when the recipient voluntarily offers to accept a sum below Guideline figures, the court will comply, finding the more modest figure to be equitable and appropriate, out of respect for the parties' superior insight into the current subtleties of their finances. The current support figure is unrelated to the division of property, assets and debts or any other deviation criteria. Future requests for modification of support may be calculated by reflecting the Guidelines then in force if circumstances then warrant.
d. Defendant father is further directed to submit certified copies of his entire personal and corporate federal income tax returns to plaintiff mother each year, simultaneously with his filing thereof, until further order of the court.
5. ALIMONY
Defendant shall pay plaintiff periodic alimony of $30 per week for a period of five years, or until the death or remarriage of the plaintiff, whichever shall first occur.
6. MEDICAL INSURANCE
a. Defendant father shall provide medical insurance for the benefit of the minor children.
b. All uninsured medical, dental, optical, prescription, eye care and psychological expenses or other expenses related CT Page 10437 to the physical and mental health of the minor children shall be divided equally between the parties.
c. Section 46b-84(e) of the Connecticut General Statutes shall apply. Plaintiff's attorney shall supply her with a copy of that statute and review it with her in detail.
7. TAX EXEMPTION FOR THE MINOR CHILDREN
a. Defendant father will be entitled to claim both children as his tax exemption, provided he is current with all payments and with all responsibilities called for in these orders (see paragraphs 2, 3, 4, 5, 6, 8, 11, 12, 13, 14 and 15, herein) as they may be amended from time to time.
b. Plaintiff mother, from time to time, will sign the documents necessary to effectuate father's use of those tax exemptions upon his presentation and request.
8. LEVITA ROAD, LEBANON, CONNECTICUT
a. Plaintiff shall forthwith transfer her title in the family home to defendant husband by quit claim deed.
b. Defendant shall be responsible for and save plaintiff harmless from all debts associated with the family home, and all suits, claims and demands by anyone holding or claiming a lien on the aforesaid premises.
e. Plaintiff shall receive $73,000 for the transfer of her interest in the family home, or approximately 60% of the equity.
d. Defendant shall transfer $15,000 of that $73,000 sum to plaintiff within thirty days hereof.
e. Plaintiff shall prepare, and defendant shall sign, a mortgage deed and note simultaneously with the quit claim deed transfer, containing the traditional clauses, in the principle sum of $58,000 (being the balance of the $73,000 after payment of $15,000), at 7% annual interest, payable in 60 equal monthly payments of $1095.02 each, beginning January 1, 1997 and on the first day of each succeeding month thereafter.
e. Plaintiff may prepay the unpaid principle balance thereof, together with the accrued interest due to the date of payment, at any time.
f. Should the home not provide security for the payment of the $58,000 balance due, defendant shall never-the-less be CT Page 10438 responsible for that sum to plaintiff.
9. NICHOLS AND SON ELECTRIC
a. Plaintiff shall make no claim to the equipment, tools, inventory or accounts receivable of Nichols and Son Electric.
b. Defendant shall save plaintiff harmless from all the liabilities thereof.
10. PERSONALTY
a. Each party shall keep for their own use any and all items of personal property currently in their possession.
b. Notwithstanding the foregoing, plaintiff shall return to defendant one-half of the family photographs and negatives.
c. Because so much of the parties' energies were focused on custodial issues, little attention was paid to personal property. The court, therefore, urges the parties to consult in good faith, and to negotiate appropriate resolutions of those few personal property items that may have strayed from their rightful place.
11. LIABILITIES
Each of the parties shall be responsible for the debts listed on their own financial affidavit and shall save the other harmless therefrom.
12. VEHICLES
a. Plaintiff retains the 1986 Pontiac. Defendant will transfer his interest in that vehicle to her.
b. Defendant retains the 1957 Dune Buggy, the 1978 Lincoln Continental, the 1987 Chevrolet Pickup and the 1978 GL 10W motorcycle. Plaintiff will transfer any interests she may have therein to defendant.
13. INVESTMENTS
a. Plaintiff shall retain her $513.13 IRA.
b. By a Qualified Domestic Relations Order, $10,000 of the defendant's 401K plan, represented by husband as having a current cash value of approximately $21,160, shall be assigned to plaintiff. CT Page 10439
c. All savings bonds held in the parties' names shall be divided equally by face value between plaintiff and defendant. Any disputes about who is to receive a particular bond shall be resolved by each party alternately choosing a bond until all the bonds are divided between plaintiff and defendant.
d. Defendant shall pay plaintiff a lump sum of $843, within 30 days hereof, representing her one-half share of the parties' combined Individual Retirement Accounts. (Plaintiff has been assigned her IRA at 13 a., above. Defendant's IRA had a value of $2200 before its liquidation by defendant contrary to court order.)
14. LIFE INSURANCE
a. Defendant shall maintain his current $25,000 Massachusetts Mutual policy on his life, naming plaintiff as the beneficiary thereof, until both of the minor children have reached their majority.
b. During July of each year, defendant shall provide plaintiff with proof of the existence of said policy, or its equivalent, and its beneficiary designation, by written certification from the insurer.
15. COUNSEL FOR THE MINOR CHILD
a. Counsel for the minor child, William Bingham, is awarded $3000 for his services, with the court's appreciation for his thoroughness and concern.
b. Each party is directed to pay one-half of that fee within thirty days hereof.
16. NEGOTIATIONS
a. The court recognizes that the parties may have mutual preferences that have not been revealed to the court during the trial or which the court may have otherwise inadvertently thwarted.
b. Final divorce terms established by the parties themselves are historically more comfortable for the parties to live with and abide by. Therefore, the court empowers the parties to confer and to seek mutually acceptable variations of the court's orders.
c. Any such mutually negotiated modifications are to be submitted directly to the undersigned in written form, signed by all three counsel as well as the plaintiff and the defendant CT Page 10440 not later than thirty days after this judgment, without costs and without the need to establish a substantial change of circumstances.
d. Beyond that date, or before any other court, modifications shall be by the traditional route and must meet all the more formal requirements.
17. APPEAL
All foregoing orders with respect to custody and visitation shall stand and operate as interim orders of this court during the pendency of any appeal.
JOSEPH L. STEINBERG, JUDGE